UNITED STATES, Appellee

v.

Henry A. MAGYARI, Draftsman First Class
U.S. Navy, Appellant

No. 05-0300

Crim. App. No. 9801499

United States Court of Appeals for the Armed Forces

Argued January 11, 2006

Decided May 10, 2006

BAKER, J., delivered the opinion of the Court, in which GIERKE, C.J., and EFFRON and ERDMANN, JJ., joined. CRAWFORD, J., filed a separate opinion concurring in the result.

Counsel

For Appellant:  Captain Richard A. Viczorek, USMC (argued).

For Appellee:  Lieutenant Craig A. Poulson, JAGC, USNR (argued); Commander C. N. Purnell, JAGC, USN (on brief).

Military Judge:  Peter J. Straub

THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

Judge BAKER delivered the opinion of the Court.

Appellant was attached to the Commander, Submarine Force, U.S. Pacific Fleet (COMSUBPAC), in Pearl Harbor, Hawaii. On February 12, 1998, the Navy Drug Screening program randomly generated Appellant's name for urinalysis testing at the Navy Base in Pearl Harbor. At the orders of COMSUBPAC command, Appellant, a petty officer, along with thirty-five to forty other servicemembers, provided a urine sample to the urinalysis coordinators. Appellant's sample and eleven other samples from COMSUBPAC were received by the Navy Drug Screening Laboratory in San Diego, California, six days later. Appellant's sample, identified with lab accession number S9802132117, was subsequently combined in a batch of 200 samples. Appellant's sample tested positive for methamphetamine. Between receipt of the sample and release of the test results, approximately twenty lab personnel handled and/or tested Appellant's sample.

After a contested special court-martial before members, Appellant was convicted of wrongful use of methamphetamine, a schedule III controlled substance, in violation of Article 112(a), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 912(a) (2000). He was sentenced to a reduction to pay grade E-3 and a bad-conduct discharge. His sentence was approved as adjudged by the convening authority, and except for the bad-conduct discharge, was ordered executed.

United States v. Magyari, No.05-0300/NA

The United States Navy-Marine Corps Court of Criminal Appeals affirmed in an unpublished opinion, United States v. Magyari, No. NMCCA 9801499, 2000 CCA LEXIS 131, 2000 WL 703572 (N-M. Ct. Crim. App. May 13, 2000).  Upon Appellant's petition, we granted review of the following issue:

> WHETHER, IN LIGHT OF CRAWFORD v. WASHINGTON, 541 U.S. 36 (2004), APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO CONFRONT THE WITNESSES AGAINST HIM WHERE THE GOVERNMENT'S CASE CONSISTED SOLELY OF APPELLANT'S POSITIVE URINALYSIS.

We answer in the negative and affirm the decision of the Navy-Marine Corps Court of Criminal Appeals.  As spelled out below, in the context of random urinalysis screening, where the lab technicians do not equate specific samples with particular individuals or outcomes, and the sample is not tested in furtherance of a particular law enforcement investigation, the data entries of the technicians are not "testimonial" in nature. Nonetheless, the lab results and reports must satisfy the standard for reliability established in Ohio v. Roberts, 448 U.S. 56, 66 (1980).

BACKGROUND

Appellant testified at his court-martial that he was aware of the Navy's zero tolerance policy on drug use and that he had never knowingly violated it.  No witness testified to ever seeing Appellant use unlawful drugs in his fifteen years of naval service.

3

The Government's case against Appellant consisted of a lab report from the Navy Drug Screening Laboratory in San Diego that showed Appellant's urine sample tested positive for methamphetamine. The Government called four witnesses to introduce the evidence contained in the lab report. The Government called three witnesses stationed at COMSUBPAC in Hawaii, who were involved in the initial collection of Appellant's urine sample. These witnesses included: Sonar Technician Chief Michael S. Szymonik, the urinalysis coordinator, Chief Operations Specialist Steve Hapeman, the designated urinalysis coordinator at the time of Appellant's testing, and Fire Control Technician Chief David R. Chadwick, who observed the Appellant fill his sample bottle in the men's head. One witness was called from the Navy Drug Screening Laboratory in San Diego, Mr. Robert J. Czarny, a civilian quality assurance officer. Mr. Czarny testified about how urine samples are handled and how results are generated at the Laboratory. Mr. Czarny signed off on Appellant's report upon its release, but he was not personally involved in the handling or testing of Appellant's sample. The Government did not call any of the lab technicians at the Navy Drug Screening Laboratory whose names appeared on the lab report and chain of custody documents, and who reviewed Appellant's paperwork, tested his urine sample, or prepared the lab report.

4

Appellant's defense counsel cross-examined Mr. Czarny, but did not call any of the other lab personnel who handled or tested Appellant's urine sample.  Appellant now argues that his constitutional right to confront the witnesses against him was violated and that any statements contained in the lab report that indicated his urine tested positive for the presence of methamphetamine were inadmissible testimonial hearsay and could not be used against him at trial.

## DISCUSSION

When an error is not objected to at trial, plain error analysis applies.  United States v. Gilley, 56 M.J. 113, 122 (C.A.A.F. 2001).  To prevail under a plain error analysis, Appellant must show that: (1) "there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right."  United States v. Tyndale, 56 M.J. 209, 217 (C.A.A.F. 2001).  If Appellant meets his burden of showing plain error, the burden shifts to the Government to prove that any constitutional error was harmless beyond a reasonable doubt. United States v. Brewer, 61 M.J. 425, 430 (C.A.A.F. 2005).

The Confrontation Clause of the Sixth Amendment states that "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI.  In Crawford v. Washington, the Supreme Court held that in order for the prosecution to introduce

"testimonial" out-of-court statements into evidence against an accused, the Confrontation Clause requires that the witness who made the statement be unavailable, and that the accused have had a prior opportunity to cross-examine the witness.  541 U.S. 36, 53-54 (2004).

Prior to Crawford, the admissibility of out-of-court statements was controlled by Ohio v. Roberts.  Under Roberts, the statements of an out-of-court witness could be admitted against an accused if the statements carried adequate indicia of reliability.  Roberts, 448 U.S. at 66.

The Crawford Court departed from the Roberts framework for admitting out-of-court hearsay statements, and transformed the inquiry to one hinging on whether the out-of-court statement comes within the scope of the Sixth Amendment because it "bears testimony" against an accused.  Crawford, 541 U.S. at 51.  "'The lynchpin of the Crawford decision . . . is its distinction between testimonial and nontestimonial hearsay . . . .'"  United States v. Scheurer, 62 M.J. 100, 104-05 (C.A.A.F. 2005) (quoting United States v. Hendricks, 395 F.3d 173, 179 (3rd Cir. 2005)).  Where nontestimonial statements are at issue, the statements do not fall within Crawford's scope and may be exempted from Confrontation Clause scrutiny altogether.  Crawford, 541 U.S. at 68.

However, the Crawford Court did not "spell out a comprehensive definition of 'testimonial,'" leaving to lower courts the responsibility to determine which statements qualify as "testimonial" and fall within its scope. Id. Nevertheless, the Court identified three forms of "core" testimonial evidence. They include: (1) ex parte in-court testimony; (2) extrajudicial statements in formalized trial materials; and (3) statements made under circumstances that would cause a reasonable witness to believe they could be used at trial. Id. at 51-52. Further, the Court identified examples of testimonial hearsay, including "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." Id. at 68.

In addition, the Crawford Court linked its analysis to the legal policies underpinning the right to confrontation. It noted that the focus of the Confrontation Clause is to protect criminal defendants from prosecutorial abuse and the "[i]nvolvement of government officials in the production of testimony with an eye towards trial." Id. at 56. Thus, the application of Crawford not only depends on the meaning of "testimonial," but on the circumstances and context in which out-of-court statements are generated, and whether the out-of-court statements were made under circumstances that would lead an objective witness reasonably to believe that the statement

7

would be available for use at a later trial by the government.
Id. at 52.

The question before this Court is whether the data entries
in Appellant's urinalysis lab report made by the Navy Drug
Screening Laboratory technicians constituted testimonial
statements, or whether in the alternative, they represented
nontestimonial hearsay, subject to the indicia of reliability
analysis under Roberts.

The Appellant contends that the data recorded in the lab
reports are statements by the lab technicians and that these
statements fall under the third category of core testimonial
evidence identified in Crawford because the lab technicians
would have anticipated that the lab report would be used against
him at trial. The Government argues that the lab reports are
business records and therefore are by definition nontestimonial
in nature and fall outside Crawford's scope.

On the one hand, technicians working in government
laboratories screening and testing urine samples are surely
aware that a sample testing positive for a controlled substance
may be used to prosecute the provider of the sample. On the
other hand, not all urine samples test positive, and not all
positive results end in prosecution. The record in this case
reflects that the lab technicians work with batches of urine
samples containing about 200 samples each. The technicians do

not equate a particular sample with a particular person; instead, they assign identification numbers to every sample. The vast majority of samples analyzed do not test positive for illegal substances. The lab technicians handling samples work in a nonadversarial environment, where they conduct routine series of tests requiring virtually no discretionary judgments. The lab technicians handling Appellant's particular sample had no reason to suspect him of wrongdoing, and no reason to anticipate that his sample, out of all the 200 samples in the batch, would test positive and be used at a trial.

In this context, the better view is that these lab technicians were not engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial. Rather, their data entries were "simply a routine, objective cataloging of an unambiguous factual matter." United States v. Bahena-Cardenas, 411 F.3d 1067, 1075 (9th Cir. 2005). See also State v. Dedman, 2004-NMSC-37, ¶ 30, 136 N.M. 561, 569, 102 P.3d 628, 636 (finding that a blood alcohol report was prepared in a nonadversarial setting). Because the lab technicians were merely cataloging the results of routine tests, the technicians could not reasonably expect their data entries would "bear testimony" against Appellant at his court-martial. See Commonwealth v. Verde, 827 N.E.2d 701, 704 (Mass. 2005) (drug tests are nontestimonial if they are "mere[ ] records of

primary fact, with no judgment or discretion on the part of the analysts"). This conclusion is consistent with the Crawford Court's policy concerns that might arise where government officers are involved "in the production of testimony with an eye toward trial" and where there is "unique potential for prosecutorial abuse" and overreaching. Crawford, 541 U.S. at 56.

Approximately twenty different people conducted tests, made clerical data notations in Appellant's records, or at one time had physical custody of Appellant's urine sample while it was at the Navy Drug Screening Laboratory. There is no indication that any of these individuals had reason, or were under pressure, to reach a particular conclusion about Appellant's sample, number S9802132117, or that they had reason to distinguish sample number S9802132117 from the other thousands of samples routinely screened and tested by batch at the laboratory.

To be clear, we reach this conclusion based on the facts of this case. The Government's contention that lab reports are inherently not testimonial because they are business and public records goes too far. For sure, Appellant's lab report is a business record. Military Rule of Evidence (M.R.E.) 803(6) implies that lab reports are included in the definition of business records because forensic laboratories are impartial examining centers and a laboratory report is a record of

"regularly conducted" activity.  At trial, the Government elicited ample testimony verifying that Appellant's report was completed in the normal course of the Navy Drug Screening Laboratory's business.  Further, lab results, DNA analyses, and hospital records, are oftentimes prepared in the course of routine, "regularly conducted" business.

Nonetheless, the same types of records may also be prepared at the behest of law enforcement in anticipation of a prosecution, which may make the reports testimonial.  See State v. Norman, 125 P.3d 15, 19 (Or. Ct. App. 2005) (concluding that the Sixth Amendment was not implicated where technicians did not function "as the proxy of the police investigation concerning [the] defendant").  Thus, lab results or other types of routine records may become testimonial where a defendant is already under investigation, and where the testing is initiated by the prosecution to discover incriminating evidence.  For example, cross-examination may be appropriate where a particular defendant is accused of rape and law enforcement conducts and seeks to admit the results from a blood or DNA test.  See People v. Rogers, 780 N.Y.S.2d 393, 397 (N.Y. App. Div. 2004).  Cross-examination may also be necessary where a suspect is believed to have operated a vehicle under the influence of drugs or alcohol and a record or affidavit is prepared by hospital personnel for the prosecution's use at trial.  See Las Vegas v. Walsh, 91 P.3d

591, 595 (Nev. 2004), modified by 100 P.3d 658 (Nev. 2004). But these factors are not at play in the case addressed today and we need not and do not determine in what other contexts Crawford might apply.

Having determined the data entries in the lab report are not testimonial under Crawford, and that there was no plain error, we must still determine whether the lab reports were properly admitted as evidence at trial. In Scheurer, this Court held that when the Crawford framework does not apply, the "Ohio v. Roberts requirement for particularized guarantees of trustworthiness continues to govern confrontation analysis for nontestimonial statements."[1] 62 M.J. at 106 (internal footnote omitted).

This Court therefore analyzes Appellant's claim under the Roberts framework, which provides that if "the declarant is unavailable to be cross-examined, the Confrontation Clause permits the admission of a hearsay statement in a criminal trial only if: (1) the statement 'falls within a firmly rooted hearsay exception,' or (2) it bears other 'particularized guarantees of trustworthiness.'" Id. at 107 (quoting Roberts, 448 U.S. at 66).

---

[1] "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law . . . ." Crawford, 541 U.S. at 68.

12

The first Roberts condition is satisfied here because the lab report was simply a record of "regularly conducted" activity of the Navy Drug Screening Laboratory that qualifies as a business record under M.R.E. 803(6), a firmly rooted hearsay exception.  As the Supreme Court emphasized in Roberts, "[p]roperly administered the business and public records exceptions would seem to be among the safest of the hearsay exceptions.'"  Roberts, 448 U.S. at 66 n.8 (internal quotation marks omitted).  See also United States v. Bridges, 55 M.J. 60, 63 (C.A.A.F. 2001) (business record exception is firmly rooted). The Roberts analysis is disjunctive, we need not determine whether the lab report at issue in this case carried other particularized guarantees of trustworthiness.  Consequently, we conclude there was no error and that the lab report satisfies the requirements of the Roberts test for nontestimonial evidence and the statements contained in the lab report were properly admitted as evidence at Appellant's trial.

DECISION

The decision of the United States Navy-Marine Corps Court of Criminal Appeals is affirmed.

United States v. Magyari, No. 05-0300/NA

CRAWFORD, Judge (concurring in the result):

I respectfully concur in the result and note that "[t]he plain error issue is not unique to military practice . . . . [and] we should apply Supreme Court precedent in determining whether we correct an error not raised at trial."  United States v. Cary, 62 M.J. 277, 279 (C.A.A.F. 2006) (Crawford, J., concurring in the result).